UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GARRETT H.,[1]

    *Plaintiff,*

v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

    *Defendant.*

No. 24-cv-12643-PGL

**MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS
AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER**

LEVENSON, U.S.M.J.

INTRODUCTION

Plaintiff Garrett H. ("Plaintiff") brings this action pursuant to § 405(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner[2] (the

"Commissioner") of the Social Security Administration ("SSA"), which denied Plaintiff's claims

for Title II Disability Insurance Benefits ("DIB"). Plaintiff appeals the November 27, 2023,

---

[1] Plaintiff's last name is omitted in compliance with the recommendation of the Committee on Cout Administration and Case Management of the Judicial Conference of the United States. *See*, Comm. on Ct. Admin. & Case Mgmt. of the Jud. Conf. of the U.S., *Privacy Concern Regarding Social Security and Immigration Opinions* (May 1, 2018).

[2] When Plaintiff brought this suit, the Commissioner was Martin O'Malley. On May 7, 2025, Frank Bisignano was sworn in as the Commissioner. Pursuant to Fed. R. Civ. P. 25(d), Commissioner Bisignano is substituted as the defendant in this action.

ruling by the administrative law judge ("ALJ"),[3] which concluded that Plaintiff is not disabled within the meaning of the Social Security Act.

Plaintiff alleges that he has for the past several years been disabled as a result of frequent and debilitating migraine headaches and accompanying seizure-like lapses of consciousness/awareness. Although Plaintiff's medical record reflects a history of migraines prior to his alleged date of onset of disability, his onset date is based on a May 5, 2021, incident when Plaintiff lost consciousness while driving and was injured in the ensuing car crash. Plaintiff's medical record reflects a variety of ailments, including psychological disorders such as PTSD related to Plaintiff's military service, but this appeal focuses on Plaintiff's history of migraine headaches.[4]

Before the Court are Plaintiff's motion for judgment on the pleadings (Docket No. 14) and the Commissioner's cross-motion for an order affirming the decision of the Commissioner (Docket No. 17). Plaintiff asks the Court to remand for an award of benefits or alternatively for further proceedings. Docket No. 14-2 at 26.[5] The parties have consented to adjudication by the undersigned Magistrate Judge. Docket No. 11; see 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

Plaintiff's motion for judgment on the pleadings will be granted, and the Commissioner's motion to affirm will be denied. As discussed below, the ALJ misstates the controlling legal standard. The circumstances of this case are in important respects similar to those in *Sacilowski*

---

[3] In this case, and in general, the decision of the Commissioner is a decision by an ALJ, as the Commissioner's designee.

[4] The United States Department of Veterans Affairs ("VA") has found Plaintiff disabled (under VA standards) based on his PTSD. However, the VA's disability finding—under different regulatory criteria—does not control the decision in this case.

[5] Citations to Plaintiff's Brief at Docket No. 14 are to the ECF-generated page numbers at the top of the page.

*v. Saul*, 959 F.3d 431 (1st Cir. 2020). As in that case, there is no evidence in the record to contradict or rebut Plaintiff's "testimony about [his migraines] and their frequency and severity, nor the medical reports supporting them." 959 F.3d at 439. Accordingly, as in *Sacilowski*, a remand for entry of an order awarding disability benefits is in order.

## I.    Background

### A.    *Factual Background*

Plaintiff was 41 years old at the alleged onset of his disability. R. 32.[6] He graduated from high school, took some college classes, and worked for twenty-three years as an automotive mechanic and a fleet manager, both during active duty in the military and as a civilian. R. 43, 618, 1024.

Although Plaintiff's medical record reflects a variety of medical and psychological ailments, I will focus on his history of migraines and associated symptoms.

On May 5, 2021, Plaintiff was driving to work when he lost consciousness and collided with another vehicle. *See*, *e.g.*, R. 959, 1129, 1031, 1131, 1137, 1431. The following week, Plaintiff lost consciousness again while driving and collided with a pole. R. 1129. Plaintiff reported to his doctor that he did not remember either incident and that he had been experiencing forgetfulness, dizziness, nausea, and increased headaches, and had fallen. R. 1438, 1453, 2033. Plaintiff reported ongoing brain fog, confusion, daily headaches, and numbness to the upper extremities. R. 1133, 1099.

After the two episodes of losing consciousness while driving in May of 2021, Plaintiff embarked on a years-long medical journey seeking answers and relief from the headaches,

---

[6] Citations to the record ("R.") refer to the SSA Administrative Record of Social Security Proceedings filed by the Commissioner on December 14, 2024. Docket No. 9. Citations use the record's pagination, as shown on the lower right corner of each page.

vertigo, and nausea that followed. He persistently pursued treatments to reduce his symptoms, including pharmaceuticals (Aimovig (R. 735), Depakote (R. 727), Keppra (R. 593), Trileptal (R. 1096), Botox (R. 295)), physical therapy (R. 882), and referrals to specialty clinics (Neuro-Ophthalmology (R. 1527), PNES clinic (R. 2191), Otoneurology (R. 451)).

Plaintiff's medical record reflects multiple emergency room visits related to his migraines, seizures, and falls: (May 6, 2021 (R. 1642); May 25, 2021 (R.1638); June 20, 2021 (R. 576); November 3, 2021 (R. 1558–71)). Plaintiff had two multi-day hospitalizations (May 25–28, 2021 (R. 1637–38); November 3–8, 2021 (R. 1590–93). Plaintiff underwent manifold tests, most of which were inconclusive or failed to identify a physiological source of the issues. Some tests appear to have been informative. *See, e.g.,* R. 281 ("neuro-opth notes voluntary nystagmus. meei confirmed perceptural (sic) postural dizziness"); R. 295 ("convergence spasm - confirmed dx by neuro-ophthalmology"); R. 452 ("vestibular testing was indeed abnormal but . . . there is no organic eye disease present to explain his symptoms."). However, as discussed below, there are no records of objective tests that could definitively diagnose migraines.

In the years following the alleged onset of disability, Plaintiff attended frequent medical appointments. He typically attended an average of two appointments per week across all of his impairments and consulted a wide range of specialists in an effort to address his headaches and dizziness. Plaintiff devoted substantial amounts of time to ongoing, regularly scheduled treatment, including physical therapy for vertigo (R. 2422–23), psychotherapy for depression, anxiety and PTSD (R. 2371–75), and regular Botox injections to manage his migraines and vertigo (R. 2313–15). His medical appointments at the VA hospital, as well as the transportation to and from the appointments, entailed significant time commitments. *See* R. 52.

### B.    Procedural History

On March 9, 2022, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning on May 5, 2021. R. 73. His claim was initially denied on October 26, 2022 (R. 63–71), and again upon reconsideration on June 1, 2023 (R. 72-82). On June 7, 2023, Plaintiff requested a hearing before an ALJ, which was conducted via teleconference on October 19, 2023. R. 39–62, 94. On November 27, 2023, the ALJ issued a decision finding that Plaintiff was not disabled and denying his claim. R. 17–34. Plaintiff sought review by the SSA's Appeals Council, which denied his Request for Review on August 16, 2024 (R. 4–9), rendering the ALJ's decision a final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Having exhausted his administrative remedies, Plaintiff now seeks further review in this Court. *See* Docket No. 1.

## II.    Legal Standard

### A.    Standard of Review

Section 405(g) of the Social Security Act provides that an applicant for benefits may seek review, in this Court, of the Commissioner's decision on their application. 42 U.S.C. § 405(g). The court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. *Id.*

Reversal is warranted if an incorrect legal standard was used or if the final decision is not supported by substantial evidence. *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). A reviewing court examines questions of law de novo (*Seavey*, 276 F.3d at 9), but the court must defer to the ALJ's factual findings as being supported by substantial evidence "if a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a mere scintilla," and "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 103 (quoting *Consol. Edison Co. of New York*, 305 U.S. at 229). The Court must affirm the ALJ's findings, even if the record could support a different conclusion, when there is substantial evidence to support the ALJ's findings. *See Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

On the other hand, a decision of the Commissioner denying benefits will not be upheld if the Commissioner "has committed a legal or factual error in evaluating a particular claim." *See Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting *Sullivan v. Hudson*, 490 U.S. 877, 885 (1989)). An ALJ's findings will not be deemed conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Sacilowski*, 959 F.3d at 437 (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

"Under the Social Security Act, courts are empowered 'to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Sacilowski*, 959 F.3d at 437 (citing 42 U.S.C. § 405(g); *Seavey*, 276 F.3d at 8–9; *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014)). "[E]very Court of Appeals has recognized that in

6

appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits." *Sacilowski*, 959 F.3d at 437 (quoting *Garrison*, 759 F.3d at 1019). "Courts have generally exercised this power when it is clear from the record that a claimant is entitled to benefits." *Id.* (quoting *Garrison*, 759 F.3d at 1019); *see also Seavey*, 276 F.3d at 11–12.

### B.    *Standard for Entitlement to Disability Benefits*

To qualify for benefits, claimants must demonstrate that they are "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. § 423(d) (defining "disability" in the context of DIB). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The impairment must be severe enough to prevent a claimant from performing not only work done previously, but also "any other kind of substantial gainful work which exists in the national economy." *See id.* § 423(d)(2)(A).

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled and thus entitled to benefits. *See Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001); *see also* 20 C.F.R. § 404.1520(a)(4) (setting forth the five steps applicable to DIB); 20 C.F.R. § 404.1520a (providing additional guidance on the evaluation of mental impairments in the context of DIB). The five steps are as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5.

### III.    The ALJ's Findings

In considering Plaintiff's claim, the ALJ followed the five-step sequence to determine whether Plaintiff was entitled to disability benefits.

#### A.    Step 1

At Step 1, an ALJ considers whether the applicant is currently engaged in substantial gainful work activity. *Seavey*, 276 F.3d at 5. If so, the applicant is not disabled. *See id.*

Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 5, 2021, his alleged onset date, and she proceeded to Step 2. R. 22.

#### B.    Step 2

At Step 2, an ALJ considers whether the applicant has a "severe medically determinable physical or mental impairment that [is expected to result in death or has lasted or is expected to last at least twelve continuous months], or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). If not, the applicant is found not to be disabled. *See id.*

Here, the ALJ found that Plaintiff had seven medically determinable severe impairments: (i) vertigo, (ii) seizure disorder, (iii) migraines, (iv) anxiety, (v) depression, (vi) PTSD, and (vii) somatic disorder. R. 22. Step 2 being non-dispositive, the ALJ continued to Step 3.

#### C.    Step 3

At Step 3, an ALJ considers whether the applicant's "impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations." *Seavey*, 276 F.3d at 5. If so, the applicant is found to be disabled. *See id.* The "listed" impairments are set forth in Appendix 1 to 20 C.F.R. Part 404, Subpart P.

Here, the ALJ reportedly considered all of Plaintiff's impairments and determined that he "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the applicable regulations. R. 23–24. Thus, the ALJ did not find Plaintiff disabled at Step 3, and she continued to Step 4. *See* 23–24.

As discussed below, Plaintiff argues that the ALJ committed reversible error by failing to evaluate whether Plaintiff's migraine headaches and seizures medically equaled the severity of a listed impairment. Specifically, Plaintiff contends that the ALJ should have considered medical equivalence to listing 11.02, for epilepsy.

### D.    "Step 3.5"[7]

At Step 4 an ALJ considers whether a claimant's physical and mental ability to work is such that he can still perform jobs he has done in the past ("past relevant work"). Similarly, at Step 5 the ALJ considers whether a claimant has the physical and mental ability to perform any other jobs that exist in significant numbers in the national economy. Before the ALJ can address Step 4 or 5, the ALJ must make findings about the claimant's physical and mental ability to do work, on a sustained basis, notwithstanding any limitations caused by the claimant's impairments. This determination of what a claimant is able to do in the workplace is referred to as the claimant's Residual Functional Capacity ("RFC"). *See* 20 C.F.R. 404.1520(e). In many cases, including this one, the RFC determination is the critical step in the process.

---

[7] Although the five-step litany is indelibly etched into the regulations and case law, the nomenclature is somewhat misleading. Often in Social Security appeals, including in this one, determination of a claimant's RFC—which is not one of the five enumerated steps—is the key issue. When a claimant's impairments do not equal a "listed" impairment at step three, the ALJ must assess the claimant's RFC in light of the claimant's medical condition as a whole in order to address Steps 4 and 5. In those steps the ALJ must consider what work a claimant is able to do based on the RFC. Thus, the RFC determination is often decisive in the analysis of a disability claim. *Cf., e.g.*, *Maniscalco v. Colvin*, 167 F. Supp. 3d 207, 215 (D. Mass. 2016) (identifying the RFC determination as the ALJ's fifth, of seven, findings).

In determining an individual's RFC, the ALJ is required to follow a two-step process. *See* 20 C.F.R. § 404.1529. The first step requires "objective medical evidence from an acceptable medical source" to demonstrate an impairment(s) which could reasonably be expected to produce the symptoms alleged. *Id*. The second step entails a broader inquiry, looking beyond the objective medical evidence, considering all reported medical conditions (in combination), and requiring the ALJ to "carefully consider any other information" an individual may submit regarding his symptoms, including "statements about the intensity and persistence of . . . pain." *Id*.

Here, the ALJ found at the first step of the RFC inquiry that Plaintiff has impairments, demonstrated by objective medical evidence, that could be expected to produce his symptoms. At the second step, however, the ALJ concluded that Plaintiff's statements regarding his symptoms were "not entirely consistent" with the medical record. On that basis, the ALJ ruled that Plaintiff retained the RFC to perform light work:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit, stand and walk for 6 hours each in an 8-hour workday. He can never climb ladders, ropes and scaffolds and must avoid concentrated exposure to hazards such as heavy machinery, moving mechanical parts, unprotected heights, uneven terrain and sharp objects. He must avoid concentrated exposure to pulmonary irritants such as dust, gas, fumes, and poor ventilation. He can understand, remember, and carry out simple instructions for 2 hours at a time, over an 8-hour day and 40-hour workweek. He can tolerate occasional interaction with coworkers, supervisors, and the public. He can adapt to simple changes in workplace routine.

R. 24.

As discussed at length below, Plaintiff contends that the ALJ's reasoning and factfinding regarding the RFC were flawed and that the ALJ committed reversible error in connection with her determination of Plaintiff's RFC. *See Docket* No. 14-2 at 22.

### E.    Step 4

At Step 4, "if the applicant's [RFC] is such that he or she can still perform past relevant work," an applicant is found not to be disabled, and the application is therefore denied. *Seavey*, 276 F.3d at 5. Prior jobs are considered "past relevant work" if they were performed within the past 15 years, if they constituted "substantial gainful activity," and if they lasted long enough for the claimant to learn how to do the job. 20 C.F.R. § 404.1560(b)(1).

Here, the ALJ determined that Plaintiff's prior experience as an auto mechanic and garage supervisor was past relevant work and substantial gainful activity. Based on Plaintiff's RFC, the ALJ concluded that Plaintiff was unable to perform "past relevant work as actually or generally performed." R. 32.

### F.    Step 5

At Step 5, "if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work," then the applicant is found to be disabled, and the application is granted. *Seavey*, 276 F.3d at 5. Conversely, if the ALJ finds that the applicant can perform one or more jobs that exist in significant numbers in the national economy, then the ALJ must deny the application. As to Step 5, only, the Commissioner bears the burden of showing that there are other jobs in the economy that claimant can perform, notwithstanding his or her limitations and restrictions. *Goodermote v. Sec'y of Health & Hum. Servs.*, 690 F.2d 5, 7 (1st Cir. 1982).

In this case, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a)." R. 32. The ALJ relied on the testimony of a vocational expert who opined that a person of Plaintiff's age, education, work experience, and RFC could perform several jobs, such as housekeeper/office cleaner, janitor, or kitchen helper/dishwasher. R. 33. Finding that a

11

significant number of those jobs exist in the national economy, the ALJ concluded that Plaintiff was not disabled. *Id.*

## IV.    Discussion

Plaintiff's arguments on appeal fall into two categories:

First, Plaintiff challenges the ALJ's RFC determination, pointing to a variety of flaws in the ALJ's reasoning (errors of law), and in the ALJ's factfinding (conclusions unsupported by substantial evidence). Among other things, Plaintiff contends:

- The ALJ erroneously disregarded his long and well-documented history of debilitating migraines, and his testimony about the frequency and severity of his symptoms. The ALJ incorrectly supposed that such migraines could not form the basis for a disability finding because there are no "objective findings even though migraine pain cannot be verified objectively." Docket No. 14-2 at 23–24.

- The ALJ discounted the reports from Plaintiff's treating physician, without any meaningful discussion of *which portions* the ALJ found unpersuasive, or why. *Id.* 18–22.

- To the extent that the ALJ discounted Plaintiff's testimony about his symptoms based on findings about Plaintiff's day-to-day activities, the ALJ's findings were not supported by substantial evidence. *Id.* at 25–26.

- The ALJ failed to consider whether Plaintiff's conditions would entail frequent absences from work or time off task to the point that he would be effectively unemployable. *Id.* at 17.

These various contentions are discussed in separate sections of this memorandum.

Second, on an independent track, Plaintiff argues that the ALJ erred by failing to consider at Step 3 whether Plaintiff's migraine headaches—which the ALJ had identified at Step 2 as a severe impairment—were medically equal to the listing for epilepsy, 11.02. *Id.* at 9.

The Commissioner argues that the ALJ properly applied the law to the evidence in the record.

### A.    *The ALJ Erred in Determining Plaintiff's RFC*

#### 1.    *The Analytical Framework*

ALJs evaluating a claimant's pain symptoms in connection with an RFC determination must follow a two-step process, as set forth in Social Security Ruling ("SSR") 16-3p. SSR 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 82 Fed. Reg. 49462 (Mar. 28, 2016). First, the hearing officer must determine "whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.*

As the text of SSR 16-3p makes clear, it is at the first step of the RFC determination under SSR 16-3p—linking symptoms to a medically determinable impairment—that the ALJ must consider clinical and laboratory results. *See* SSR 16-3p ("We call the medical evidence that provides signs or laboratory findings objective medical evidence. We must have objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms.").

In this case, the ALJ found that this first step was satisfied. R. 30 ("After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. . . ."). As noted

above, the ALJ found that Plaintiff had seven medically determinable impairments, including migraines.

If the first step is satisfied, the ALJ then moves on to the second step and must evaluate the intensity and persistence of the pain to determine its limiting effects. In conducting that inquiry, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p. The required evaluation includes consideration of the medical evidence, as well as consideration of other evidence, such as a claimant's testimony about the location, duration, frequency, and intensity of their pain. In the "other evidence" category, the hearing officer evaluates factors which can include, insofar as they are relevant and present in the record:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p (citing 20 CFR §§ 404.1529(c)(3), 416.929(c)(3)). In the First Circuit, the factors used to evaluative subjective complaints of pain are commonly referred to as the "*Avery*" factors,

14

in reference to *Avery v. Secretary of Health and Human Services*, 797 F.2d 19, 29 (1st Cir. 1986). *See, e.g., Balaguer v. Astrue*, 880 F. Supp. 2d 258, 268–69 (D. Mass. 2012) (discussing *Avery* factors).

It is at the second step, the evaluation of the *Avery* factors, that an evaluation of the Plaintiff's testimony, and consideration of the testimony in relation to the entire record, comes into play. *See* SSR 16-3p. In conducting this second step evaluation, the presence of "objective medical evidence" is no longer controlling. On the contrary, SSR 16-3p explicitly instructs that "[w]e will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.*

> 2.    *The ALJ Erroneously Insisted that Objective Medical Signs and Laboratory Tests Were Required to Establish the Severity and Frequency of Plaintiff's Migraine Symptoms*

In this case, the ALJ determined at Step 2 that Plaintiff's migraines constituted a severe impairment that was "medically determinable." R. 22. She further determined, in connection with her RFC determination, that Plaintiff's symptoms were attributable to his migraines: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 30.

At the next step of the analysis, the ALJ erroneously assumed, without citing any pertinent source of authority, that migraine symptoms must be disregarded when there are not "medical signs and laboratory findings" to explain the severity of those symptoms. R. 30. As a matter of law, this is incorrect—and it is an error that pervades the ALJ's decision.

The heart of the ALJ's reasoning is laid out in the final paragraph on page R. 30 (carrying over to R. 31). At the outset of that paragraph, the ALJ explicitly eschews any suggestion that Plaintiff is malingering or exaggerating his migraine symptoms[8]:

> I do not doubt that the claimant's symptoms from headaches, seizures and vestibular disorder, that appear throughout the record are legitimate and due consideration has been given to his statements about these conditions (See SSR 16-3p).

R. 30. In the very next sentence, however, the ALJ pivots to the flatly mistaken legal premise for her decision to discount all of Plaintiff's testimony about the severity of his symptoms and the effects of his migraines (and also to discount his history of medical treatment and his doctors' corroborating treatment notes):

> However, no symptoms or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

R. 30.

The ALJ's reasoning conflates the two steps, and applicable standards, of the inquiry required for evaluating subjective symptoms as required under SSR 16-3p. In this case, the ALJ had expressly found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 30. But having made that finding, ALJ incorrectly carried the evidentiary requirements for finding a medically determinable impairment into her consideration of the *severity* of Plaintiff's symptoms. Brushing aside Plaintiff's well-documented treatment history—which included multiple emergency room visits, hospitalizations, numerous prescription medications, Botox treatments, and other medical interventions—the ALJ

---

[8] In a few spots, the ALJ appears to question Plaintiff's credibility with respect to his account of his daily activities. These are discussed below.

16

erroneously imported the "objective evidence" requirements directly into her assessment of

Plaintiff's testimony about the severity of his symptoms:

> Although I note the claimant has undergone extensive treatment and workup for these symptoms, the objective evidence falls short of demonstrating the existence of limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis at the modified light level.

R. 30. By phrasing her analysis in terms of whether "the objective evidence falls short of

demonstrating" the severity of the Plaintiff's symptoms, the ALJ abandoned SSR 16-3p's

assurance that "[w]e will not evaluate an individual's symptoms based solely on objective

medical evidence." SSR 16-3p.

After a brief detour to characterize Plaintiff's daily activities (which I will discuss in a

later section of this memorandum), the ALJ doubled down on her misplaced emphasis on the fact

that the *severity* of Plaintiff's symptoms could not be established by objective medical evidence:

> Multiple physicians have noted the claimant's physical examination is benign with no evidence of neurological compromise. He has undergone vestibular testing that has been for the most part within normal. He has been worked up for seizures and tried on different medications with no decrease in episodes or improvement in function. Most recently, the record indicates many of the claimant's symptoms are believed to be functional versus physiological.

R. 30–31.

Beginning the next paragraph, the ALJ wrote:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because the medical evidence reflects less severe limitations.

R. 31. It is unclear whether this sentence concerns the preceding discussion of Plaintiff's

testimony about the severity of his migraine symptoms, or whether it is part of the

17

discussion that follows, which concerns Plaintiff's psychiatric symptoms.[9] Either way, the ALJ's terminology reflects a fundamental legal error: Consistency is emphatically not the same thing as corroboration, but the ALJ uses the two concepts interchangeably. As the First Circuit noted long ago, "[i]n determining the weight to be given to allegations of pain, we have stated that complaints of pain *need not be precisely corroborated by objective findings*, but they must be consistent with medical findings." *Dupuis v. Sec'y of Health & Hum. Servs.*, 869 F.2d 622, 623 (1st Cir. 1989) (emphasis added) (citing *Avery*, 797 F.2d at 21, and *Da Rosa v. Sec'y of Health and Hum. Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)).

"Consistency" is, of course, a touchstone for credibility findings. *Cf. Frustaglia v. Sec'y of Health & Hum. Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) ("In weighing the evidence and evaluating the claimant's credibility, the ALJ is entitled to consider the 'consistency and inherent probability of the testimony.'" (quoting *Beavers v. Sec'y of Health, Ed. and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). But describing testimony as "inconsistent" when there is no suggestion of contradiction is wrong. While an ALJ's credibility findings are generally subject to deference upon review, no such deference is warranted when the ALJ's findings rest upon an error of law or a failure of basic logic. *See Da Rosa,* 803 F.2d at 26 (remand was required where "the ALJ apparently discounted [claimant's] testimony concerning his pain and physical limitations because the extent of pain alleged was not corroborated by objective medical evidence.").

---

[9] The ALJ's finding that Plaintiff's psychiatric symptoms did not preclude all gainful employment is not at issue in this appeal.

To be fair, there are a couple of confounding factors that may have blurred the picture for the ALJ. First, a considerable portion of the medical record was focused on Plaintiff's other impairments, including his long and complicated history of PTSD, which had been the basis for a Department of Veterans Affairs ("VA") determination that Plaintiff was unable to work.[10] R. 153–55. This may partly explain the dearth of analysis regarding Plaintiff's migraine symptoms in the assessments provided by the state medical reviewers.

Second, migraines have posed difficulties for numerous ALJs, precisely because batteries of medical tests are employed to rule out possible causes, while objective findings regarding the migraines themselves are scarce. As Judge Saris of this Court has noted, "[u]nderstandably, migraines pose a difficult challenge because the diagnosis is based largely on symptoms reported by a claimant, not objective evidence." *Dunn v. Colvin*, No. 15-cv-13390, 2016 WL 4435079, at 12 (D. Mass. Aug. 19, 2016).

Courts have repeatedly rejected ALJ findings that rely on "normal" test results in denying disability benefits for migraine patients. In *Moon v. Colvin*, the Seventh Circuit reversed the district court's affirmation of a denial of benefits where the ALJ had relied on an "unremarkable" MRI to conclude that the claimant's migraines were not a significant problem. 763 F.3d 718, 722 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014). Much like Plaintiff here, the claimant in *Moon* had testified that she had headaches on most days, and that the pain would often be so bad that she would need to lie down in the dark until it passed. *Id.* at 720. In the RFC analysis at issue in *Moon*, the

---

[10] As the ALJ explained in her decision, the VA finding does not control the outcome in this case. R. 31–32.

ALJ had pointed out that "a 2008 MRI of [the claimant's] head was "unremarkable,"

showing "no cause for headaches." *Id.* at 721. The Seventh Circuit rejected that analysis

and found it was not "logically connected to [the ALJ's] determination of [the claimant's]

residual functional capacity," in part because the ALJ had relied on the MRI result, when

an unremarkable MRI is entirely consistent with a diagnosis of migraines. *Id.* at 721–22.

As the court noted, "[d]octors use MRIs *to rule out other possible causes of headache—*

such as a tumor—meaning that an unremarkable MRI is completely consistent with a

migraine diagnosis." *Moon*, 763 F.3d at 722 (emphasis in original).

Cases within this district reinforce the point that undue reliance on laboratory tests

in rejecting a disability claim based on migraines is reversible error. Most notably, Judge

Saris in *Dunn* cited the Seventh Circuit's decision in *Moon* and amplified the point as

follows:

> [T]he ALJ's reliance on the unremarkable findings of the CT scan and neurological exams is not justified. Because migraines are symptom-based, neuroimaging tests do not confirm a migraine diagnosis, but rather are used to exclude other causes of headaches (like a tumor). *See Moon*, 763 F. 3d at 721[]. The government argues, "Critically, however, [P]laintiff does not point to any objective evidence supporting her allegations of severe migraine headaches." Docket No. 24 at 8-9. The government does not explain what objective evidence would prove up a migraine. Generally available literature suggests that migraines are diagnosed based on clinically-reported symptoms like nausea, aura, and vomiting—all of which existed here. *See Migraine, Stedman's Medical Dictionary* 1118 (27th ed. 2000) (defining migraine as "[a] symptom complex occurring periodically and characterized by pain in the head (usually unilateral), vertigo, nausea and vomiting, photophobia, and scintillating appearance of light").

*Dunn*, 2016 WL 4435079, at *11.

In *Dunn*, as in this case, the record reflected a long history of emergency treatments,

hospitalizations, and aggressive medication strategies to address the debilitating symptoms

of the migraines at issue. Similar medical histories are reflected in other decisions in this

district in which ALJ decisions were overturned for failure adequately to consider the *Avery*

factors in assessing migraine symptoms. In *Brown v. Astrue*, the court reversed the ALJ's findings because the ALJ failed to consider or discuss the plaintiff's migraines, which were found to be severe, when determining RFC. 09-cv-40211-FDS, 2011 WL 3421556, at *8 (D. Mass. Aug. 3, 2011). Among other things, the plaintiff in *Brown* had a history of emergency room treatment, which included a radiological examination with negative results. *Id. at *2*. Along the same lines, in *Carr v. Astrue*, the court reversed and remanded an ALJ's denial of a disability claim that was based on migraine symptoms. 09-cv-10502-NG, 2010 WL 3895189, at *1 (D. Mass. Sept. 30, 2010). The *Carr* decision emphasized that the claimant had reported suffering from "nearly daily headaches and weekly migraines" and that Carr had testified to "having headaches every day, more severe migraines between three and five days each week, and a monthly migraine lasting ten to twelve days." *Id.* The court reviewed the symptoms of Carr's severe headaches, including "pain, memory and concentration deficits, sensitivity to light and sound, drooping of the right side of her face and right eye, slurred speech, nausea, and fatigue" and the variety of medications she took, and Carr's reports of needing to rest a substantial portion of the day. *Id.*

Even when "the evidence of disability is somewhat mixed," an ALJ cannot simply disregard a claimant's testimony about the frequency and severity of symptoms without a reasoned explanation of the credibility determination. *See Laboy v. Colvin*, No. 16-cv-30081, 2017 WL 3668413, at *15–16 (D. Mass. Aug. 24, 2017).

Of course, not everyone who suffers from migraines is disabled. Judges in this district have frequently affirmed ALJs' rejections of disability claims based on migraines. There is, however, a sharp contrast between the treatment histories and symptoms in those cases and the

circumstances of this case. For instance, in *Allison M. v. Kijakazi*, No. 22-cv-10033-FDS, 2023 WL 5650100, at *8, *12 (D. Mass. Aug. 31, 2023), "the medical records indicate[d] that [the claimant's] migraine headaches were 'recurrent/chronic,' 'occasional,' and 'stable,' and that she used analgesics as needed. . . . [h]owever, there is no evidence that she was prescribed medication or otherwise treated for migraines, nor that they had an appreciable effect on her physical or mental functioning." Similarly, in *Tammy M. v. Kijakazi*, physician notes indicated that the plaintiff's "migraines were 'very rare' and 'managed.'" 22-cv-10949-FDS, 2023 WL 5353337, at *8 (D. Mass. Aug. 21, 2023). In addition, the ALJ had noted in *Tammy M.* that the plaintiff "did not require aggressive treatment, such as nerve blocks, Botox injections, or frequent emergency room visits, to address her condition." *Id.* So too, in *Andrade v. Colvin*, "by all reports, the migraines were not medically intractable, and were considered amenable to treatment." 14-cv-12153-JGD, 2015 WL 5749446, at *6 (D. Mass. Sept. 30, 2015). In *Jorge v. Colvin* as well the court focused on the history of medical treatment and complaints: "the medical records do not indicate that Plaintiff complained of migraines at any time to any treating physician after July 26, 2011, did not have any emergency room visits or hospitalizations for migraine symptoms after that date, and was also not taking any prescribed medication for migraines." 14-cv-11179-DPW, 2015 WL 5210519, at *9 (D. Mass. Aug. 17, 2015).

In simple terms, the varying outcomes in the migraine cases in this district correspond to the differing factual circumstances of the claimants' treatment history and reported symptoms. This is unsurprising, but it underscores the key point here: Consideration of the *Avery* factors entails a careful and exacting review of the record. Cursory references to "medical signs and laboratory tests" cannot satisfy or supplant the required analysis.

In this case, the ALJ dutifully recited the *Avery* factors in her overview of the governing legal framework. *See* R. 25. But her discussion of the record evidence is pervaded by her unfounded insistence that only objective test results matter.

### 3.    Plaintiff's Credibility and History of Treatment

As the First Circuit pointed out in *Avery*, "so long as statements of a claimant or his doctor are not inconsistent with the objective findings, they could, if found credible by the adjudicator, permit a finding of disability where the medical findings alone would not." 797 F.2d at 21. In this case, the ALJ has—with minor exceptions—found that Plaintiff's testimony about his symptoms was credible. R. 30 ("I do not doubt that the claimant's symptoms from headaches, seizures and vestibular disorder, that appear throughout the record are legitimate . . . ."). There is, moreover, nothing in the record to meaningfully contradict Plaintiff's testimony.[11]

In the medical record, and in the ALJ's decision, Plaintiff's migraine history is interspersed with his history of treatment for PTSD and other mental disorders. But his description of his migraine symptoms was straightforward—and uncontradicted. As the ALJ recapped it:

> He [testified] he is taking multiple medications for seizures and migraines. The claimant described a seizure as starting off with an aura with brightness, tingling and then he gets dizzy and loses time and space. The [staring] episodes occur three to four times daily and can last a few seconds or a minute. . . . The claimant reported there are no typical days. He wakes up at varying times. When he wakes up, he said one of the worst things is he is dizzy and nauseous, and some days has blurred vision. He generally has to wait until the symptoms subside to start his day.

---

[11] As discussed below, it is this absence of contradictory evidence—coupled with the strength of the evidence of Plaintiff's disability—that warrants remand for an award of benefits.

R. 26. Although the ALJ had found the Plaintiff credible, and even noted his "strong work history" (R. 25), she concluded that she was compelled—based on her erroneous understanding of the controlling law—to disregard his testimony regarding his migraine symptoms.

As quoted previously, in her analysis of Plaintiff's RFC, the ALJ back-handed Plaintiff's long history of treatment and testing with a terse acknowledgement: "Although I note the claimant has undergone extensive treatment and workup for these symptoms, the objective evidence falls short . . . ." R. 30. Swept into this acknowledgement is Plaintiff's entire history of treatment, which the ALJ had recounted at some length earlier in her decision. *See* R. 26 (first two paragraphs addressing migraine and seizures), R. 27 (describing vertigo, "brightness" associated with migraines, and daily "intermittent throbbing" for which "he generally needs to lie down, close his eyes and rest for about 20 minutes until the pain diminished to a tolerable level"), R. 28 (first full paragraph, describing emergency room treatment for migraines), R. 29 (reporting mental health and migraine issues, including "Botox injections for convergence spasms and migraines"). Also swept into this acknowledgement is Plaintiff's history of pharmaceutical treatments: Aimovig (R. 735), Depakote (R. 727), Keppra (R. 593), Trileptal (R. 1096), and Botox (R. 295).

Having erroneously concluded that only "medical signs and laboratory findings" (R. 30) mattered to the RFC determination, the ALJ went on to note Plaintiff's emergency room visits and hospitalizations in her decision. For example, on June 20, 2021, Plaintiff was treated at the emergency room for a migraine headache; a week later he was admitted for a transitory loss of consciousness (R. 26); and on October 3, 2022, "the claimant was treated at the Emergency Department for migraine headache with dizziness, nausea, and bradycardia," and was given a protocol of Toradol, Compazine, and Benadryl with slight improvement and discharged in stable

24

condition (R. 28). Even while acknowledging Plaintiff's "extensive treatment and workup" for his symptoms, the ALJ found that the "objective evidence falls short of demonstrating the existence of limitations" with the requisite severity in her RFC analysis. R. 30.

In short, the ALJ's consideration of Plaintiff's RFC failed to adequately account for the uncontradicted evidence about Plaintiff's symptoms and his treatment, all of which the ALJ brushed aside as irrelevant given the lack of objective signs and laboratory tests. In the ALJ's words: "As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because the medical evidence reflects less severe limitations." R. 31

Critically, although the ALJ used the word "inconsistent," she identified no evidence that contradicts Plaintiff's testimony. Instead, as noted above, the ALJ erroneously conflated "consistency"—a touchstone of credibility—with corroboration by medical tests. To the extent the ALJ's ruling might be considered a "credibility" finding, it is devoid of reasoned explanation and is not entitled to any deference. Here, the First Circuit's decision in *Da Rosa* provides a useful point of reference. 803 F.2d 24. In *Da Rosa*, the First Circuit reversed and remanded an ALJ's decision denying benefits, based on the ALJ's failure to properly consider the *Avery* factors. *See* 803 F.2d at 26. In *Da Rosa*, it was unclear whether the ALJ's assessment of the claimant's credibility had been tainted by improperly factoring in the absence of objective medical evidence to corroborate the claimant's testimony about pain and physical limitations. *Id.* (noting that ALJ "apparently discounted" the claimant's testimony based on the lack of objective medical evidence to corroborate it). Thus, in *Da Rosa*, a remand was required to properly weigh the credibility question. *Id.* In this case, by contrast, the reasoning error in ALJ's decision is explicit. Having found credible Plaintiff's description of his symptoms ("I do not doubt that the

claimant's symptoms from headaches, seizures and vestibular disorder, that appear throughout the record are legitimate . . ." R. 30), the ALJ discarded that finding based on an erroneous supposition that only objective medical evidence mattered: "As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent *because* the medical evidence reflects less severe limitations." R. 31 (emphasis added).

### 4.    The Report of Plaintiff's Treating Physician

Dr. Berger, a neurologist who had treated Plaintiff throughout the period of claimed disability, provided an Epilepsy/Seizure (nonconvulsive) Disorder Questionnaire (R. 2538) and a Pain Questionnaire (R. 2539) in which he stated that Plaintiff suffers "very frequent (multiple x daily) episodes of perceptual postural dizziness," and headaches that occur three to four times per day, every day, and which preclude "sustained concentration/productivity needed for full time employment." R. 2538, 2539.

The ALJ addressed Dr. Berger's opinion as follows:

I find the opinions of Dr. Berger, partially persuasive. Objective evidence fails to support the frequency and severity of the symptoms that would preclude light unskilled work. The claimant has undergone extensive work up, most of which has been normal and fails to explain his report of daily symptoms due to perceptual postictal dizziness. Further Dr. Berger acknowledged the claimant is no longer experiencing blackouts and alteration of consciousness episodes, which shows improvement.

R. 32.

The ALJ's decision does not identify which aspects of Dr. Berger's opinions she found persuasive or unpersuasive, apart from her reference to the lack of objective evidence regarding the frequency and severity of Plaintiff's symptoms. It is apparent that in this finding, as throughout her decision, the ALJ's reasoning is suffused with her erroneous assumption that only "objective evidence" can support an RFC finding regarding the frequency or severity of a claimant's symptoms. As when the ALJ brushed aside Plaintiff's testimony, the only flaw that

the ALJ identifies in Dr. Berger's opinion is that "[o]bjective evidence fails to support the frequency and severity of the symptoms" and that Plaintiff's testing has mostly been "normal and fails to explain his report of daily symptoms." R. 32. In no other respect does the ALJ indicate a basis for finding Dr. Berger's opinion only "partially persuasive."

With the demise of the "treating physician rule"[12] as a general matter, "[u]nder the regulations governing [Plaintiff's] application, an ALJ does not assign specific evidentiary weight to any medical opinion and need not defer to the opinion of any medical source (including the claimant's treating providers)." *Richardson v. Saul*, 565 F. Supp. 3d 154, 167 (D.N.H. 2021) (citing 20 C.F.R. § 404.1520c(a)). That said, it is telling that the ALJ's analysis omits any discussion of Dr. Berger's medical specialty (he is a neurologist, *see* R. 2359) or of Dr. Berger's experience treating Plaintiff over multiple years. Dr. Berger began seeing Plaintiff after the May 2021 car crashes, when Plaintiff lost consciousness while driving. Thereafter Dr. Berger treated Plaintiff on multiple occasions for over two years, prescribing and adjusting migraine medications, administering tests, and referring Plaintiff to other programs when Plaintiff's symptoms did not improve significantly under his care. *See* R. 312; 2538. Dr. Berger diagnosed Plaintiff with chronic migraines and disturbance of consciousness, and prescribed Depakote and Aimovig medications. R. 2165, 722, 735.

---

[12] Under the previous standard, which applied to claims filed prior to March 27, 2017, a treating physician's opinion was given "controlling weight" so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The current rule, codified at 20 C.F.R. § 404.1520c, does not accord any "defer[ence] or give any specific evidentiary weight, including controlling weight," to medical opinions from a claimant's treating medical provider. 20 C.F.R. § 404.1520c(a). *See Richards v. Kijakazi*, 554 F. Supp. 3d 242, 248 (D. Mass. 2021).

27

In assessing opinion evidence, an ALJ must consider the persuasiveness of medical opinions in the case record. *See* 20 C.F.R. § 404.1520c(b). To determine an opinion's persuasiveness, the ALJ must consider the opinion's "supportability, consistency, relationship, specialization, and other factors." *Harrison v. Saul*, No. 20-cv-10295, 2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021) (citing C.F.R. §§ 404.1520c(c)(1)–(5)). The most important factors in the assessment of an opinion's persuasiveness are supportability and consistency; indeed, these are usually the only factors the ALJ is required to articulate. 20 C.F.R. § 404.1520c(b)(2); *Devine v. Kijakazi*, 627 F. Supp. 3d 10, 23 (D. Mass. 2022). As to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be. 20 C.F.R. § 404.1520c(c)(1). As to consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be. 20 C.F.R. § 404.1520c(c)(2).

The ALJ provided no reasoned consideration of the supportability of Dr. Berger's medical opinion or its consistency with the record as a whole. Indeed, the ALJ's discussion of Dr. Berger's opinion evidence was not framed in terms of supportability or consistency as dictated by the regulations. Instead, the decision simply echoed the ALJ's erroneous assumption that only objective testing can support a disability finding. As noted above, the only articulated reason for finding Dr. Berger's opinions to be only partially persuasive was that "[o]bjective evidence fails to support the frequency and severity of the symptoms" and that most of the workup Plaintiff had undergone "has been normal." R. 32.

By erroneously treating the lack of determinative test results as a legally conclusive factor, the ALJ's decision misapplied the *Avery* factors, which expressly require consideration of

28

a claimant's treatment history including "4. The type, dosage, effectiveness, and side effects of any medication an individual takes . . .; 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; [and] 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms . . . ." SSR 16-3p. In so doing, the ALJ effectively ignored the considerable evidence in the record of objective findings and clinical decision-making that are broadly consistent with Plaintiff's reported symptoms, even if they do not purport to demonstrate or measure Plaintiff's pain. For example, in December of 2021, Dr. Berger reported "vestibular testing suggestive of ocular flutter or opsoclonus but neuro-opth eval felt unlikely though noted voluntary nystagmus . . . mulitple (sic) hospital admissions unrevealing." R. 2259. In February of 2022, Dr. Berger recommended additional vestibular testing because Plaintiff still had headaches every day and recommended further adjustment to Aimovig and Depakote dosages. R. 438.

On April 29, 2022, Dr. Berger reported that Plaintiff was still getting headaches every day, lasting hours and up to half the day, becoming light and sound sensitive and needing to lie down. R. 2227. At that visit, Dr. Berger noted that Plaintiff had received an evaluation at MEEI, where he had been recommended for additional testing and neuro-opth evaluation, but there had been "no clear answers." *Id.*

The record here is clear: Dr. Berger has treated Plaintiff for persistent and debilitating migraines (and accompanying seizure issues) for several years and lucidly describes the impact of those migraine symptoms. His medical opinion confirms the obvious point that no objective tests have identified a physiological or anatomical cause for Plaintiff's migraines (*see* R. 2539), but it unequivocally attests to the severity and frequency of Plaintiff's symptoms. R. 2538–39.

29

As discussed in the next sections of this memorandum, nothing in the record contradicts Dr. Berger's opinion.

a.        State Examiners' Opinions

There is no medical opinion evidence in the record, apart from Dr. Berger's opinion, regarding the debilitating effects of Plaintiff's migraines. Although state agency physicians provided opinions that support the ALJ's RFC determination with respect to Plaintiff's mental disorders, those opinions are conspicuously lacking in any meaningful discussion of Plaintiff's migraines.[13] *See* R. 64–71, 73–82. The ALJ's decision recites: " . . . I find persuasive the opinions of the State Agency physicians and their opinions support the limitations determined herein. (Exhibits 2A, 4A)." R. 31. But the ALJ's discussion of those opinions does not even mention Plaintiff's migraines. *Id.* As for the opinions themselves, while they mention Plaintiff's migraines in passing, along with his seizure disorder, the opinions include no discussion of whether Plaintiff's migraine symptoms are disabling. *See* R. 68 ("43 yr 1 mth old Male with a central vestibular disorder. Symptoms include Vertigo, Blurry vision, Migraines, fatigue, ringing in ears and LOC. Symptoms can be unpredictible and he has brief periods when he feels well. CT of head showed no hemorrhage or infarction."); R. 80 ("Lives in a house with family. Is unable to concentrate, access memory. Causes audio and visual disturbances. Unable to function for periods of time. Has sx of vertigo, blurry vision, migraines, fatigue, ringing in ears and loss of consciousness."); R. 77 ("He reports migraines have been better."); R. 80 ("11/18/2022 neurology. Moves all extremities equally. Gait with normal base and steady. Given Botox for migraines."); R. 80 ("He continues to be treated for migraines and seizure disorder. []Notes

---

[13] As noted above, Plaintiff does not challenge the ALJ's finding that his psychological condition is such that he could perform unskilled work.

indicate that seizures are non epileptic. There is no definitive etiology for vertigo and there is a suggestion that these symptoms may also be psychogenic. Abnormal eye movements are voluntary per record.").

In short, the state examiners concluded—without any apparent consideration of the impact of Plaintiff's migraines—that Plaintiff could perform light work.[14] Other than this unexplained conclusion, their opinions contain neither analysis nor findings to contradict Dr. Berger's assessment of Plaintiff's migraines.

b.       "Normal" Exam Findings

Echoing the ALJ's erroneous conclusion that only objective tests are sufficient to establish the degree of pain that may be attributed to a medically determined severe impairment, the ALJ's decision noted that several types of medical tests have been "normal." *See* R. 27 (quoting from medical record: "EEGs were normal and MRI normal. Spinal fluids were normal. They also noted psychological overlay is possible but not the cause but rather a compounding factor.").

In the paragraph explaining the rationale for disregarding Plaintiff's testimony about his symptoms, the ALJ wrote:

> Multiple physicians have noted the claimant's physical examination is benign with no evidence of neurological compromise. He has undergone vestibular testing that has been for the most part within normal. He has been worked up for seizures and tried on different medications with no decrease in episodes or improvement in function. Most recently, the record indicates many of the claimant's symptoms are believed to be functional versus physiological.

---

[14] The fact that the state examiners found that Plaintiff could work in an environment with "unlimited" noise and vibration (*see* R. 79), strongly suggests that they were not focused on the medical records reflecting Plaintiff's migraines. *See* R. 28 ("On October 3, 2022, the claimant was treated at the Emergency Department for migraine headache with dizziness, nausea and bradycardia. He reported a worsening headache with photophobia, *phonophobia*, blurry vision and nausea for past 3 days.") (emphasis added).

R. 30. In the same vein, in explaining why the ALJ discounted Dr. Berger's opinion, the decision states: "The claimant has undergone extensive work up, most of which has been normal and fails to explain his report of daily symptoms due to perceptual postural dizziness." R. 32.

Insofar as reliance on Plaintiff's history of "normal" test results might be considered as an independent basis for the ALJ's decision, it cannot withstand scrutiny. As discussed above, in *Moon v. Colvin*, the Seventh Circuit rejected as not "logically connected" the ALJ's reliance on an "unremarkable" MRI to conclude that a claimant's were not a severe medically determinable disorder. 763 F.3d at 722. In *Moon*, as in this case, there was nothing in the record to suggest that an unremarkable MRI was inconsistent with a diagnosis of migraines.

Given that there was no meaningful input about migraines from the state examiners, it is possible that the ALJ simply reached her own conclusions about the significance of "normal" test results in considering migraine pain. Any such conclusions, however, would be beyond the ALJ's purview. "[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record." *Fitts v. Kijakazi*, 691 F. Supp. 3d 390, 401 (D.N.H. 2023) (quoting *Jabre v. Astrue*, No. 11-cv-332, 2012 WL 1216260, at *8 (D.N.H. Apr. 5, 2012), *report and recommendation adopted sub nom. Jabre v. US Soc. Sec. Admin.*, No. 11-CV-332-JL, 2012 WL 1205866 (D.N.H. Apr. 9, 2012)); *see Moon*, 763 F.3d at 722. "[W]hen assessing a claimant's RFC, '[t]he general rule is that an expert is needed to assess the extent of functional loss.'" *Fitts*, 691 F. Supp. 3d at 401 (quoting *Roberts v. Barnhart*, 67 F. App'x 621, 622–23 (1st Cir. 2003)). An ALJ may provide "common sense judgments" about a claimant's RFC but may not "overstep

the bounds of a lay person's competence and render a medical judgment." *Gordils v. Sec'y of Health & Hum. Servs.*, 921 F.2d 327, 329 (1st Cir. 1990).

If indeed the ALJ drew her own inferences about the meaning of Plaintiff's test results and how those results related to Plaintiff's functional limitations, those inferences are not supported by substantial evidence and do not provide any meaningful counterweight to Dr. Berger's opinion evidence.

c.    Dr. Berger's Use of the word "Disability"

In his brief to this Court, the Commissioner takes issue with the fact that Dr. Berger's reports advert, at least indirectly, to the ultimate legal issue in this case: whether Plaintiff's migraines prevent him from engaging in gainful employment. The Commissioner seems to argue that these references somehow render Dr. Berger's opinions unpersuasive in all respects. *See* Docket No. 18 at 9–10 (citing R. 2539).

Dr. Berger completed two forms regarding Plaintiff's condition. *See* R. 2538 ("11.03 Epilepsy/Seizure (nonconvulsive) Disorder Questionnaire") and R. 2539 ("Pain Questionnaire"). In the Epilepsy/Seizure questionnaire, Dr. Berger's handwritten notes state that "[b]lackouts and alteration of consciousness episodes have ceased but still has very frequent (multiple x daily) episodes of perceptual postural[15] dizziness which cause him disability." R. 2538. In the Pain Questionnaire Dr. Berger checked "yes" after a question: "Is the pain of such severity as to preclude sustained concentration and productivity which would be needed for full time

---

[15] Dr. Berger's handwriting is difficult to decipher, and the typed paragraph proceeding the handwritten note refers to "postictal" manifestations, but it appears that Dr. Berger used the word "postural" to describe Plaintiff's episodes in this questionnaire. The ALJ cited "perceptual *postictal* dizziness" in her analysis. R. 30. Postictal is defined as "Following an epileptic seizure." *Postictal*, Oxford English Dictionary (online ed. 2024). Both terms (postural and postictal) appear in the record

33

employment on an ongoing sustained basis?" Dr. Berger added a handwritten note, "has HA [headaches] 3-4x/day, precluding sustained concentration/productivity needed for full-time employment." R. 2539.

The Commissioner is correct that the term "disability" in the context of a DIB application refers to a legal construct that requires consideration of the claimant's medical condition (and attendant RFC) in conjunction with evidence about jobs available in significant numbers in the national economy. It is not for a physician, but for the ALJ, to make the ultimate determination whether a claimant is "disabled" within the meaning of the 42 U.S.C. § 423(d).

While the ultimate determination of disability within the meaning of the statute is for the ALJ, neither common sense nor precedent suggest that an ALJ can or should simply disregard the medical opinion of a treating physician if some portion of that opinion appears to put a toe over the line into the ALJ's bailiwick. *See Bjornson v. Astrue*, 671 F.3d 640, 647–48 (7th Cir. 2012) (holding that doctor describing a claimant as "disabled" is not a basis for discarding his opinion); *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (explaining that the Commissioner is not relieved of the obligation to state specific and legitimate reasons for rejecting a treating physician's opinion, even if the treating physician rendered an opinion on the ultimate issue of disability).

In any event, the ALJ did not adopt any such rationale for rejecting Dr. Berger's opinion. As discussed above, the ALJ's only articulated reason for rejecting Dr. Berger's opinion was the fact that objective medical tests did not confirm or corroborate that opinion. R. 32. In this respect, the Commissioner's argument appears to be a last-ditch attempt to salvage the ALJ's determination, but it fails to suggest any rational basis for ignoring the opinion of Plaintiff's long-time treating neurologist regarding the nature and frequency of his migraines.

34

5.      *Activities of Daily Living*

The ALJ's decision asserts that Plaintiff's "activities of daily living have not been significantly compromised by his impairments, despite his assertions." R. 30. This remarkable conclusion flies in the face of the record and seems to be premised on the ALJ's erroneous notion that any symptoms not corroborated by objective evidence must be disregarded. As a finding of fact, the ALJ's conclusion is not supported by substantial evidence. Furthermore, to the extent that the ALJ's RFC determination may have relied on supportable findings about Plaintiff's daily activities, placing undue emphasis on such findings is a misapplication of the *Avery* factors.

As written, the ALJ's consideration of Plaintiff's activities of daily living is difficult to parse. It is unclear whether (on the one hand) the ALJ's findings are simply a reflection of her mistaken assumption that only objective medical evidence can support findings about frequency or severity of pain, or whether (on the other hand) these are intended as straightforward factual findings. Although the ALJ's comment that Plaintiff's daily activity "have not been significantly compromised" sounds like a finding of fact, this assertion follows almost immediately (in the same paragraph) after the ALJ's erroneous contention that "no symptoms or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms." R. 30.

Further complicating the analysis is that all of this language is found in a paragraph that begins: "I do not doubt that the claimant's symptoms from headaches, seizures and vestibular disorder, that appear throughout the record are legitimate . . . ." R. 30. Having acknowledged that Plaintiff's symptoms were "legitimate" and having, indeed, concluded that they precluded

Plaintiff from returning to his prior work, "the ALJ was required to consider evidence in addition to medical tests, including, *inter alia,* claimant's statements, opinions of treating physicians, reports of claimant's activities and claimant's course of treatment." *Nguyen v. Chater*, 172 F.3d 31, 34 (1st Cir. 1999) (citing 20 C.F.R. § 404.1529(c)).

Earlier in the decision, the ALJ recounted Plaintiff's testimony regarding his daily activities as follows:

> The claimant reported there are no typical days. He wakes up at varying times. When he wakes up, he said one of the worst things is he is dizzy and nauseous, and some days has blurred vision. He generally has to wait until the symptoms subside to start his day. Has eats a breakfast bar in the morning and does PT at the VA one or two times a week. He may play with dogs when he is doing okay. He helps with dishes and laundry when he can. He said he tries to read and watch television throughout the day but due to spasms in his eyes, he can't always do it. He is limited in what he can read and watch. He said he rests between 2-4 hours per day most days due to symptoms. The claimant recently attempted to go to amusement park with his family and he testified that he and his family always went camping in NH. When they went in 2021, his wife went alone. The next two years, his wife drove the truck and they usually go to Santa's Village. He needs multiple breaks because being in a car triggers many of his symptoms. Prior to these issues he was very active and would ski and dirt bike with kids and now he can't. He states that he does not bathe at home alone at this point in case he falls.

R. 26.

Notwithstanding this relatively fulsome account of Plaintiff's testimony, the ALJ's decision points to only two things to support her anomalous assertion that Plaintiff's daily activities "have not been significantly compromised." First, the ALJ asserts that "nothing in these notes supports [Plaintiff's] testimony that he needs to lie down for 2-4 hours daily" *Id.* Second, the ALJ points out that that Plaintiff reported "trying to spend time with his kids, tinkering around outside and studying history." R. 30.

As for the first point, Plaintiff's counsel points out that Dr. Berger's opinion plainly reflects that Plaintiff's migraines come three to four times per day (R. 2539), and medical records from the Neurology Department at Veteran's Affairs dated March 2, 2022, document

36

that the Plaintiff informed his neurologist that during migraines he experienced throbbing near the right eye and side of his head and stated that he turned off the light, lay down and closed his eyes for about 20 minutes until pain diminished to a tolerable level. R. 735 ("Daily intermittent R eye and side of head near ear that throbbing. States that he turns off light, lay down and close eyes and about 20 minutes pain diminishes to a tolerable level."). This does not add up to a full two to four hours, but it can hardly be said that "nothing in these notes" supports Plaintiff's testimony regarding this recurrent interruption of ordinary daily functioning.

As for the second point, the ALJ's analysis fails of its own weight. The fact that Plaintiff *tries* to spend time with his kids and do other things cannot remotely support the ALJ's finding that his daily activities "have not been significantly compromised." Indeed, the evidence before the ALJ overwhelmingly showed the opposite. During questioning by the ALJ, Plaintiff testified that he plays with his dog "when he's feeling okay," that he will do some dishes and the laundry, "if he's able," and tries to read and watch some TV, but that these activities can precipitate migraines. R. 48. Plaintiff also testified that he doesn't "bathe unless someone's home," doesn't socialize, and that conversion spasms limit what he can read or watch because those activities bring on migraines. R. 48, 50, 56. Plaintiff testified that bright lights, constant noise, bending over, looking up, or a couple of minutes of car travel exacerbate his symptoms to the point where he must spend some time, or the remainder of the day, resting in bed. R. 52, 54.

Even in her statement of the case, the ALJ has misstated the evidence. Contrary to the ALJ's assertion that Plaintiff can drive, socialize with friends and family and do activities with his children, Plaintiff testified that he does not drive, does not socialize, and is unable to take part in activities with his kids. *Compare* R. 25 (ALJ's assertion that Plaintiff "can drive but does not

often.") *with* R. 45 (Plaintiff's testimony: "No, I am not able to drive.")[16]; *compare* R. 23 (ALJ's statement that Plaintiff "continues to socialize with his family and friends") *with* R. 50 (Plaintiff's testimony: "I don't socialize; I don't have many I don't have many friends anymore."); *compare* R. 24 (ALJ's claim that Plaintiff "is able to . . . do activities with his children.") with R. 55–56 (Plaintiff's testimony listing activities he has been unable to do since 2021).

To the extent that the ALJ's findings deviate from the testimony without explanation, they are unsupported by substantial evidence.

Even if the ALJ had accurately recounted Plaintiff's activities, she was not free to disregard his testimony without a reasoned explanation. *See Wright v. Barnhart*, 389 F. Supp. 2d 13, 23 (D. Mass. 2005) ("If the ALJ finds that a claimant is not credible, this finding must be supported by substantial evidence and detailed findings." (citing *Da Rosa*, 803 F.2d at 26)). Indeed, even when "evidence of disability is somewhat mixed," an ALJ cannot simply disregard a claimant's testimony about the frequency and severity of symptoms without a reasoned explanation of the credibility determination. *See Laboy*, 2017 WL 3668413, at *15. The decision here offers no developed explanation for disregarding Plaintiff's uncontradicted testimony.

Apart from the lack of substantial evidence to support the ALJ's factfinding regarding Plaintiff's daily activities, such findings must be considered in the context the other *Avery* factors. Although a claimant's daily activities may provide context for considering a claimant's claims of pain, the mere fact that the claimant manages sometimes to participate in limited activities does not invalidate the claims of pain. *See Smyth v. Dudek*, No. 24-cv-10497-ADB,

---

[16] The state examiners' finding—which the ALJ found "persuasive"—states, "Unable to drive due to dizziness." R. 80.

2025 WL 895362, at *46 (D. Mass. 2025) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all other forms of human and social activity." (quoting *Rohrberg v. Apfel*, 26 F. Supp. 2d 303, 310 (D. Mass. 1998)). Plaintiff's sporadic ability to participate in some modicum of household activities that are required to care for himself and participate in the life of his family is not inconsistent with his reports of daily migraines and does not demonstrate that he is capable of holding down a job. *See Sacilowski*, 959 F.3d at 440; *Ormon v. Astrue*, 497 F. App'x 81, 87 (1st Cir. 2012) (noting the difference between "a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week" (quoting *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)); *see also Carr*, 2010 WL 3895189, at *7 (finding that plaintiff's description of good days where she participated in housework, shopping, and computer classes, as well as experiencing severe headaches fifteen days out of the month, was not inconsistent with her reported level of impairment).

In sum, the ALJ's assertion that Plaintiff's daily activities "have not been significantly compromised" is not supported by substantial evidence.

### 6.       *The ALJ's Failure to Consider Absences from Work*

When symptoms of an impairment or combination of impairments would cause a claimant to be absent from work, it is reversible error for the ALJ to fail to specifically to assess the issue of absences. *Sacilowski*, 959 F.3d 431 (it was error to fail to consider plaintiff's probably absences from work caused by migraines and bladder issues that recur despite medication).

In this case, the ALJ failed to consider work absences and time off task in her formulation of Plaintiff's RFC. During the October 19, 2023, hearing, a vocational expert testified that, for a hypothetical individual of the same age, education and vocational background

as Plaintiff, absences of two days per month, or daily time off task amounting to 20% of the workday—approximately 96 minutes—would preclude the individual from maintaining competitive employment. R. 59–60. Further, the vocational expert testified that leaving early or arriving late one or more times per month on an ongoing basis would preclude maintaining competitive employment. *Id.*

During the same hearing, Plaintiff testified that he experienced migraines three to four times a day, and that he needed to rest until the symptoms abated. R. 47–49. In the pain questionnaire, Plaintiff's treating physician, Dr. Berger, reported that Plaintiff suffered from three to four headaches each day, every day, which he noted would preclude the "sustained concentration/ productivity needed for full time employment."[17] R. 2539. The ALJ's decision acknowledges that medical visit notes reflect Plaintiff's reports of daily occurrences, *see, e.g.,* R. 29 (decision noting that at a May 10, 2022 visit, Plaintiff "reported ongoing vertigo/dizziness and migraines daily and that he is not driving, working"), and that these occurrences required Plaintiff to lie down and rest until the pain abated, *see* R. 27 (summarizing VAMC neurology notes indicating that Plaintiff "reported he generally needs to lie down, close his eyes and rest for about 20 minutes until the pain diminishes to a tolerable level").

Indeed, the medical record in this case is replete with evidence of Plaintiff's frequent appointments with doctors and specialists related to his headaches, testing, and other migraine treatment. These include visits or calls on: June 04, 2021 (R. 588), June 20, 2021 (R. 576), June 21, 2021 (R. 574), July 19, 2021 (R. 562–64), July 20, 2021 (R. 560), September 30, 2021 (R. 519–20), December 07, 2021 (R. 447–49), December 07, 2021 (R. 451), February 15, 2022 (R.

---

[17] Although the ALJ found Dr. Berger's opinion "partially persuasive," her decision does not address whether she credited the portion of the opinion stating that Plaintiff lacked the "concentration/productivity needed for full time employment."

239), February 18, 2022 (R. 402), March 02, 2022 (R. 393–94), May 23, 2022 (R. 349), September 07, 2022 (R. 312), September 20, 2022 (R. 300), November 18, 2022 (R. 293), January 20, 2023 (R. 280), March 10, 2023 (R. 240), March 15, 2023 (R. 262–63). When combined with appointments for other impairments, such as anxiety, depression, and PTSD, Plaintiff's medical record reflects over eighty-five appointments in the two years following his May 2021 loss of consciousness, which averages to an appointment approximately every nine days. R. 215–593.

The circumstances here are closely analogous to those in *Sacilowski*, 959 F.3d 431. In that case, the First Circuit affirmed the district court's remand for award of benefits in a case where the claimant reported two to three migraines a week, requiring Botox treatments and other medication,[18] which symptoms would have caused her to be absent from work *Id.* at 438. In *Sacilowski*, as in this case, the Commissioner claimed that "state agency physicians, who considered Sacilowski's impairments including migraines, found she could perform a range of light work and did not specify a need for absences due to migraines or other impairments." 959 F.3d at 439. In *Sacilowski* and this case, however, there is no "contrary evidence" to rebut the evidence of disability as "there is no indication in the record that the state agency physicians were ever asked to even consider [the claimant's] impairments' impact on absences." *Id.*

Despite the evidence demonstrating frequent and consistent absences and time off task due to Plaintiff's symptoms from his migraines and other impairments, the ALJ concluded that Plaintiff is capable of performing light work, so long as he avoids climbing ladders, concentrated

---

[18] The claimant in *Sacilowski* also complained of bladder issues, but the court explicitly noted that its holding did not depend on those additional ailments. 959 F.3d at 438 n.4 (". . . we find the severity and frequency of Sacilowski's migraine headaches on their own enough to render Sacilowski disabled during the Relevant Time Period . . .").

exposure to hazards such as heavy machinery, moving mechanical parts, unprotected heights, uneven terrain, sharp objects, and pulmonary irritants. In making this RFC determination, the ALJ did not address the obvious prospect that repeated daily migraines would require Plaintiff to rest at home (as he testified). Nor did she discuss the impact this would have on his ability to hold a job, notwithstanding that the vocational expert testified that an individual with Plaintiff's limitations who would be off task 20% of the workday would be precluded from maintaining competitive employment in the national economy. *See* R. 59.

Given Plaintiff's testimony, his medical record, and the vocational expert's testimony, it was imperative for the ALJ, in determining Plaintiff's RFC, to consider and explain her findings with respect to absences from work and time off task due to migraine headaches. The ALJ's failure to do so was reversable error. *See Conrad v. Kijakazi*, 666 F. Supp. 3d 161, 178–79 (D. Mass. 2023) (finding evidence of twice monthly hospital visits and two or more four-hour migraines per week sufficient to require remand for ALJ to consider absences); *Ortiz v. Dudek*, No. 24-CV-11704-ADB, 2025 WL 1400356, at *31 (D. Mass. May 14, 2025) (quoting *Jacquelyn V. v. Kijakazi*, No. 21-cv-00314-MSM, 2023 WL 371976, at *5 (D.R.I. Jan. 24, 2023) ("'When the symptoms of an impairment or combination of impairments would cause the claimant periodically to be unable to attend work, it is reversible error if the ALJ fails specifically to assess the issue of absenteeism' or time required off-task.").

       7.    *The ALJ's RFC Determination is Not Supported by Substantial Evidence*

For the reasons set forth in the preceding sections, the RFC determination in the ALJ's decision cannot stand. On one side of the scale there is strong evidence of disability: Plaintiff's own testimony, his medical record, and his treating physician's opinion. On the other side of the scale there is nothing of weight: there is only the ALJ's erroneous understanding that only objective evidence can satisfy the *Avery* standard, an error that taints nearly all of the ALJ's

findings. Thus, the ALJ's conclusion that Plaintiff retains the RFC to perform light work is unsupported by substantial evidence.

### B.      Remand for Award of Benefits

Plaintiff has asked that the Court remand for an award of benefits. Docket No. 14-2 at 26. In the alternative, Plaintiff requests remand for further proceedings. *Id.* The Commissioner has not addressed Plaintiff's requested relief. *See generally* Docket No. 18.

As the First Circuit has noted, "a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence." *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir. 2001), *cited in Sacilowski*, 959 F.3d at 437.

As noted above, the facts in this case are similar to those in in *Sacilowski*, 959 F.3d 431, and the same result is appropriate. The Court in *Sacilowski* concluded that the evidence was "overwhelming" that the claimant's migraines would have kept her out of work at least once a month, which would have precluded full-time competitive employment. 959 F.3d at 441. The evidence here is of the same ilk.

Whether in this case we consider the evidence "overwhelming," or just "very strong" with no contrary evidence, the result is the same. The only thing that remains is to determine the amount of Plaintiff's benefits, which the Commissioner must do upon remand. Here, "the underlying facts and law are such that [the Commissioner] has no discretion to act in any manner other than to award . . . benefits." *Seavey*, 276 F.3d at 11. Having found severe impairments that could reasonably be expected to cause Plaintiff's symptoms, the ALJ erred by concluding that the record did not support the Plaintiff's evidence regarding the intensity, persistence, and limiting effects of those symptoms.

###### C.    *The ALJ Erred by Failing to Evaluate Listing 11.02 (Epilepsy)*

For the reasons set forth above, the ALJ's unsupportable RFC finding warrants remand for the purpose of awarding benefits. There is, however, another analytical error in the ALJ's decision, one that would—by itself—warrant remand, although it would not by itself support an order to award benefits.

As mentioned above, at Step 2 of the sequential analysis, the ALJ concluded that Plaintiff suffered from seven severe impairments: (i) vertigo, (ii) seizure disorder, (iii) migraines, (iv) anxiety, (v) depression, (vi) PTSD, and (vii) somatic disorder. R. 22. At Step 3, the ALJ concluded that Plaintiff did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 23.

The ALJ's Step 3 analysis centered on listings corresponding to only three of Plaintiff's severe impairments, all within the category of mental disorders: (i) 12.04 (Depressive, bipolar and related disorders), (ii) 12.06 (Anxiety and obsessive-compulsive disorders), and (iii) 12.15 (Trauma- and stressor-related disorders). R. 23. The ALJ considered whether the paragraph B criteria were satisfied for each of these listings, and concluded they were not. To meet the listings and satisfy the paragraph B criteria, the ALJ would have needed to find one extreme limitation or two marked limitations in four broad areas of functioning. *Id.* The ALJ concluded that Plaintiff had only mild or moderate limitations in each of the areas of functioning, and thus the paragraph B criteria were not satisfied for any of the three listings. R. 23–24.

Importantly, when determining that Plaintiff's impairments did not meet or equal a listing, the ALJ failed to mention the four additional severe impairments (vertigo, seizure disorder, migraines, or somatic disorder) that the ALJ had identified. Nor did the ALJ discuss

44

whether any of these four additional severe impairments were listed impairments or closely analogous (medically equal) to listed impairments.

Although the issue is likely moot,[19] the ALJ should have considered whether Plaintiff's impairments—for migraine, seizure disorder, and/or vertigo—meet, or are equivalent to, listing 11.02 (epilepsy).[20]

### 1.    Listing 11.02 (Epilepsy)

At Step 3, an ALJ must consider whether a claimant's impairments, alone or in combination, meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; *see* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Seavey*, 276 F.3d at 5. The "listings," as Appendix 1 is referred to, "describe[] for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. § 404.1525(a). To *meet* a listing, a claimant's impairment must satisfy each of the listing's criteria, including the mandated objective medical findings. 20 C.F.R. § 404.1525(c)(3). To *equal* a listing, the claimant's impairment(s) must be "at least equal in severity and duration to the criteria of any listed impairment." *See* 20 C.F.R. § 404.1526(a); *Lona D. v. Saul*, No. 20-cv-00191, 2021 WL 1788403, at *2 (D. Me. May 4, 2021), *aff'd,* No. 20-cv-00191, 2021 WL 3056373 (D. Me. July 20, 2021).

For example—and relevant to this case—headache disorders are not a listed impairment, but the SSA has issued SSR 19-4p to provide guidance on evaluating primary headache

---

[19] In the event that the Court of Appeals reverses my decision regarding the RFC findings in this case, the question of medical equivalence could come into play.

[20] It is for the Commissioner to determine—in the first instance—whether Plaintiff's evidence is persuasive, with an explanation of the basis for the determination.

disorders[21] in disability claims. SSR 19-4p, Titles II and XVI: Evaluating Cases Involving Primary Headache Disorders, 84 Fed. Reg. 44667 (Aug. 26, 2019). That guidance instructs that "[e]pilepsy (listing 11.02) [a listing within the category of neurological disorders,] is the most closely analogous listed impairment for [a medically determinable impairment] of a primary headache disorder." SSR 19-4p.

Plaintiff argues that the ALJ was obligated to consider—and to document her analysis of the issue—whether Plaintiff's migraines, alone or combined with his seizures and vertigo, were medically equivalent to listing 11.02. Plaintiff submits that the medical record demonstrates that his migraine headache disorder equaled the elements of listing 11.02(B), and, on this basis, argues that the ALJ's failure to address the listing was reversible error. Docket No. 14-2 at 9–18.

The Commissioner counters that SSR 19-4p does not explicitly require ALJs to automatically address listing 11.02 in their decisions. Docket No. 18 at 7–8. The Commissioner argues that a finding of disability based on medical equivalence at Step 3 requires that the record contain a prior administrative medical finding from a State-agency doctor, medical expert evidence, or a report from the Appeals Council's medical support staff that supports the finding of medical equivalence. *Id.* at 8–9. Even assuming the Commissioner is correct on this point, Dr. Berger's "Epilepsy/Seizure Disorder Questionnaire" (R. 2538) and "Pain Questionnaire" (R. 2539) fit the bill.[22]

---

[21] SSR 19-4p defines primary headache disorders as "a collection of chronic headache illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head," and gives migraines as an example of such disorders. SSR 19-4p.

[22] The Commissioner also cites *Jennifer M. A. v. Saul*, 2021 WL 1056426 (D. Kan. Mar. 18, 2021) as rejecting the claimant's argument that the ALJ erred by failing to address Plaintiff's primary headache disorder under SSR 19-4p. Docket No. 18 at 8. But the citation is inapt. In that case the court rejected the claimant's argument because SSR 19-4p had not been published at the

*Footnote continues on following page.*

Clearly, ALJs cannot be expected to perform a comparison of each and every one of every claimant's severe impairments to each and every listing. However, 20 C.F.R. § 404.1526(b)(2) states that "if [a claimant has] an impairment(s) that is not described in appendix 1, [the SSA] will compare [the claimant's] findings with those for *closely analogous* listed impairments." 20 C.F.R. § 404.1526(b)(2) (emphasis added). The regulation goes on to state: "[i]f the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing." 20 C.F.R. § 404.1526(b)(2).

Given that the ALJ expressly found that Plaintiff had severe impairments based on his vertigo, seizure disorder, and migraines (R. 22), the ALJ should have assessed whether the migraines could be found to be medically equivalent to the closely analogous listing of epilepsy. *Cf. Brown*, 2011 WL 3421556, at *5 (remanding for failure to discuss claimant's migraines in RFC determination and noting, "[b]ecause, however, they were found to be a severe impairment, they should have been specifically addressed.").

Does the ALJ's failure to consider the epilepsy listing make a difference? On the one hand, "[a]n ALJ's failure to address a specific listing or to elaborate on [her] conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017). On the other hand, a showing that a decision is "materially inconsistent" with the regulation may establish reversible error. See *Diaz v. U.S. Soc. Sec. Admin., Acting Com'r*, No. 14-CV-137-PB, 2015 WL 5331285,

---

time of the ALJ's decision, and the argument had been raised in the plaintiff's reply brief rather than her complaint. 2021 WL 1056426, at *7–8. In this case, by contrast SSR 19-4p was in place as of 2019, well before Plaintiff filed for disability benefits, and Plaintiff argued for consideration of SSR 19-4p in his complaint.

at *2 (D.N.H. Sept. 14, 2015) (holding that the omission of a cite to an SSR "does not establish reversible error in the absence of any showing that the decision is materially inconsistent with the regulation.").

### 2.    *Plaintiff's Evidence May Meet the Requirements of SSR 19-4p*

SSR 19-4p outlines the requirements for a finding that a claimant's migraines are equal in severity and duration to the criteria in listing 11.02B:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p.

On their face, these criteria suggest that the record in this case may support the proposition that Plaintiff's migraines were "at least equal in severity and duration to the criteria of" listing 11.02B. 20 C.F.R. § 404.1526(a).

### a.    Plaintiff's Medical Record

Plaintiff experienced migraines "occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." SSR 19-4p. As of the October 19, 2023, hearing, Plaintiff had experienced daily migraines for over two years, beginning in May 2021: well beyond the three-month threshold provided by SSR-4p. And Plaintiff's migraines persisted over this period, despite adherence to multiple treatment regimens, including pharmaceuticals

Aimovig and Depakote. R. 2165, 722, 735. There is plenty in the record to require reasoned consideration, as summarized here:

- A Detailed Description of a Typical Headache Event: Plaintiff's typical headache events were characterized by light and sound sensitivity, and dizziness (R. 1008) and vertigo and blurred vision (R. 735) that could equate to dyscognitive seizures. *See* Docket No. 14-2 at 11–13. Plaintiff reported memory gaps, daily headaches, weakness, chest pressure, nausea, lightheadedness, and worsening fatigue. R. 1034, 1065, 1071, 2539. In his initial disability determination in October of 2022, the examiner identified epilepsy—in the neurological disorders system—as a secondary severe impairment. R. 66.

- The Frequency of Headache Events: The severity and frequency of Plaintiff's symptoms fluctuated over time, but the migraine headaches did not cease. At times, Plaintiff experienced staring spells three times a day whereby he was unresponsive and confused afterwards. R. 1031, 1483, 1485. Dr. Berger's Pain Questionnaire identified that Plaintiff had three to four headaches daily. R. 2539.

- Adherence To Prescribed Treatment: Over the course of his treatment, Plaintiff was prescribed multiple seizure and migraine medications, some of which decreased the frequency and severity of his migraines but failed to stop the migraines altogether. Plaintiff began taking Aimovig in February 2022. R. 438. He initially reported no relief from the medication but continued the trial and later reported a decrease in the frequency and severity of his headaches after increasing the dosage. R. 375, 2167 (It seems to be working . . . I still get them, but I know it takes a little while to really start working. It's not as debilitating as before."). On March 11, 2022, Plaintiff

49

reported taking Aimovig and Depakote for migraines and Keppra and Trileptal for seizures. R. 169. As of August 18, 2022, Plaintiff continued to take his prescribed Aimovig and Depakote medications. R. 79. Plaintiff reported that he received no benefit from Depakote, though it may have helped with blackout spells, and that he adhered to Depakote and Aimovig. R. 2329. Eighteen months after the alleged onset of disability, in November 2022, Plaintiff was taking Aimovig and Depakote and began monthly Botox injections to address his still-daily migraines. R. 191, 2346–48. In addition to his prescribed medications, Plaintiff reported taking 4000 mg of Tylenol daily to reduce his headache pain from 8/10 to 6-7/10. R. 561.

- Side Effects of Treatment: Side effects of Plaintiff's migraine medication included weight gain, nausea, headaches and drowsiness. R. 184, 191.

- Limitations In Functioning: Plaintiff reported severe limitations in functioning due to his migraine headaches. In the October 19, 2023, hearing, Plaintiff testified that he wakes up dizzy and nauseous, with blurred vision and that this has happened every day since his initial loss of consciousness over two years before. R. 48–53. He testified that he needed to wait up to an hour and a half for his symptoms to subside before he could begin his day. R. 48. He reported being stranded at home most of the time because riding in a car triggered migraines that put him "out of it" for at least two to three hours. R. 50–52. Noise, lights, bending over, and looking up all triggered migraines for him, and he almost always wore a brimmed cap to prevent him from looking up. R. 54. Plaintiff testified that he had trouble walking down stairs, and would not bathe without someone else at home, in case he fell. R. 54, 56. Plaintiff testified that when he traveled to one of his appointments, the VA sent a car for him

50

and he would need to spend the rest of the day in bed. R. 52. As discussed above, Plaintiff also reported that he needed to rest for two to four hours every day. R. 48–49.

                b.        Legal Standards

Decisions in this district have frequently declined to overturn a denial of benefits based on a failure to assess headaches under SSR 19-4p. S*ee Allison M.*, 2023 WL 5650100, *Tammy M.*, 2023 WL 5353337, *Monteiro v. Saul*, No. 20-cv-12189-RWZ, 2022 WL 867988 (D. Mass. Mar. 23, 2022), but the circumstances in those cases are very different from this one:

In *Allison M.*, the court declined to find error where there was "no evidence in the record describing plaintiff's headaches, her treatment (beyond self-medication with marijuana), or how they limit her functioning." 2023 WL 6560100 at *9. In this case, by contrast, the record contains a detailed record of the headaches Plaintiff has reported, and the medical treatment he has received for those headaches, in the years since the alleged onset of his disability.

In *Tammy M.*, the court declined to overturn the ALJ's decision where Plaintiff made statements to her primary-care provider that her migraines were "very rare" and were being managed by "cutting down" on medications and caffeine. 2023 WL 5353337 at *2. Such reports of "very rare" migraines are in sharp contrast with the medical history in this case.

Along the same lines, in *Monteiro*, the court found that any error in "not explicitly addressing Plaintiff's migraines pursuant to SSR 19-4p" was harmless where the ALJ considered Plaintiff's reported symptoms inconsistent with daily activities that included "going to the grocery store, assisting non-English speaking neighbors at appointments, and attending church services and events." 2022 WL 867988, at *5–6.

Overall, Plaintiff has pointed to evidence that could potentially support a finding that his migraines are equal in severity and duration to the criteria in listing 11.02B. The ALJ's failure to

consider whether Plaintiff's impairments met or equaled that listing is "materially inconsistent" with the regulation. Thus, the failure to address listing 11.02 was reversable error and a remand on this issue would be warranted.

### CONCLUSION

For the forgoing reasons, the Plaintiff's motion for Judgment on the Pleadings (Docket No. 14) is ALLOWED and the Commissioner's motion for Order Affirming Decision of Commissioner (Docket No. 17) is DENIED.

Pursuant to sentence four of section 405(g), the case is remanded to the Commissioner for further proceedings consistent with this Order, that is, for determination of Plaintiff's disability benefits.

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

Dated: March 20, 2026

52